## COMMONWEALTH *vs.* KEVIN GALFORD.

Barnstable. May 5, 1992. - August 13, 1992

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Constitutional Law,* Assistance of counsel, Waiver of constitutional rights, Admissions and confessions. *Joint Enterprise. Practice, Criminal,* Instructions to jury.

In a criminal case, where the defendant was questioned by police after a valid waiver of his Miranda rights and then released when he invoked his right to counsel, and where after his arrest, three days later, the defendant again waived his rights and made a statement to the police, the rule of *Edwards* v. *Arizona,* 451 U.S. 477 (1981), did not apply to require suppression of the defendant's statements after his arrest, because he had been released from custody. [369-371]

At the trial of indictments for murder, robbery, and kidnapping, the judge's instructions to the jury on joint venture, in light of the charge in its entirety, did not create a substantial likelihood of a miscarriage of justice by reason of shifting the burden of proof on the issue of withdrawal from a joint venture, or by not calling for separate consideration of each indictment. [371-376]

INDICTMENTS found and returned in the Superior Court Department on July 16, 1987.

A pretrial motion to suppress evidence was heard by *Elizabeth J. Dolan,* J., and the cases were tried before *John D. Sheehan,* J.

*Charles W. Rankin* for the defendant.

*Russel J. Wilson,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree on the ground of extreme atrocity or cruelty, the defendant, Kevin Galford, appeals. The defendant also appeals from his convictions of kidnapping and unarmed robbery. The defendant alleges error in the denial of his motion to suppress. The de-

fendant also asserts that the instructions to the jury were erroneous and require reversal of his convictions. Last, he asks that we exercise our power under G. L. c. 278, § 33E (1990 ed.), to order a new trial. We conclude that the convictions should be affirmed and that we should not exercise our power under G. L. c. 278, § 33E, in the defendant's favor to order a new trial or enter a verdict of a lesser degree of guilt on the conviction of murder in the first degree.

*Facts.* We summarize the facts that the jury could have found.[1] On the morning of June 2, 1987, the falling tide uncovered the body of the victim on the south-side riprap of the Cape Cod Canal. A tool box had been attached to a set of automobile jumper cables which, in turn, were wrapped around the victim between his knees and ankles and then reconnected to the tool box. The victim had been bound with wire.

The autopsy revealed that the cause of death was drowning associated with blunt impact trauma or blunt impact injury. The victim suffered numerous bruises and abrasions on his head, face and body, including a black eye and a broken nose. In the opinion of the medical examiner for the Commonwealth, there was no evidence of strangulation, and the victim was alive and conscious until the time of drowning.

The police learned that the victim's BayBank automatic teller machine (ATM) card had been used in the early morning hours of June 2 to withdraw money from an ATM machine. Photographs taken by a surveillance camera at the ATM machine were developed. The man in the photographs was identified as one Robert Ferreira.[2]

---

[1] The defendant has not argued that the evidence was insufficient to support the convictions. That issue therefore is waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). *Commonwealth* v. *Wilson*, 381 Mass. 90, 92 n.3 (1980). Pursuant to G. L. c. 278, § 33E (1990 ed.), we have reviewed the evidence on the conviction of murder in the first degree. The Commonwealth presented a strong and compelling circumstantial case against the defendant. The evidence was more than sufficient to support the conviction.

[2] Ferreira was charged with the same crimes. The two men were tried separately.

In a conversation two or three weeks prior to June 1, the defendant told Ferreira "about a scam at a gay rest area where they could beat up the gay men and take their money." On the night of June 1, friends of the defendant and Ferreira drove the two men to the Route 140 rest area in Taunton. The defendant and Ferreira told their friends that they were going to the rest stop to collect money owed them and that the person from whom they were going to collect would drive them home. The defendant and Ferreira went there with the expressed intention of robbing homosexuals, who, according to the testimony, used the rest area as a place to meet. The defendant's friends saw the defendant and Ferreira walk into the woods. The defendant sat on a bench in the woods near the rest area while Ferreira hid behind some trees. The victim approached the defendant, and they talked for several minutes. At that point, Ferreira came up from behind the victim, put an electrical cord around the victim's neck, and pulled him to the ground.

On the morning of June 2, the defendant and Ferreira were driving together in an automobile that matched the description of the victim's automobile. Both the defendant and Ferreira stated to friends that the automobile's owner had given them $200 to burn it. The defendant said that he had "paid some bills" with his half of the $200, that he and Ferreira had driven the automobile to Cape Cod,[3] that he and Ferreira had used cocaine and "had been partying all night," and that they had thrown the automobile's registration and other papers out the window as they drove.[4] Both front seats of the automobile were soaking wet on the morning of June 2.

---

[3]A State chemist testified that a pair of the defendant's socks showed evidence of color transference consistent with immersion in sea water rather than fresh water. The color on the socks also was consistent with the blue dye on a pair of the defendant's sneakers. Residue on both the socks and the sneakers also was consistent with immersion in sea water.

[4]A woman found the registration and other papers by the side of a road near the Route 140 rest stop and gave them to the police.

After the murder, the defendant admitted to a friend that he had "beaten somebody up very badly," but he denied killing anyone. Sometime after June 2, the defendant saw Ferreira driving an automobile similar to the victim's automobile. There was a brief argument, during which the defendant told Ferreira to "get rid of the car[;] [b]urn it." Also sometime after June 2, the defendant asked an acquaintance to aid him in locating someone to beat up Ferreira.

According to police officers, the defendant, when questioned, first stated that he learned that Ferreira had stolen a car only when, days after June 2, he and Ferreira had gone swimming together in a pond. It was then, the defendant originally claimed, that Ferreira first told the defendant that he had stolen the automobile in which they had driven to the pond. As a result of this disclosure, the defendant explained, he walked home from the pond. In a later interview, however, the defendant admitted to having gone with Ferreira to the rest stop on Route 140 to rob men. According to the defendant, when Ferreira began beating and strangling the victim, the defendant told Ferreira to stop and then left the scene and walked home to Taunton. According to a fellow inmate of the defendant at the New Bedford house of correction, whose girlfriend was a witness in the case, the defendant told the inmate to prevent his girlfriend from testifying or else the defendant would "have her bumped off."

Testifying for the defense, Ferreira outlined the following series of events. As Ferreira started to hit the victim, the defendant told Ferreira "not to hurt him." Ferreira said he continued to "rough[ ] [the victim] up and knocked him out"; "[b]y the time [he] stopped, [the defendant] was gone." According to Ferreira, he alone located the victim's automobile and, after tying the victim up with a cord, locked him in the trunk. Ferreira next drove the automobile to purchase some cocaine, went to an ATM and withdrew $200 from the victim's bank account, purchased more cocaine, and then decided to kill the victim. Ferreira drove to the Cape Cod Canal and threw the victim into the canal. Ferreira said that he drove the victim's automobile to the house where the

defendant was staying and picked him up. The two men ingested some of the cocaine Ferreira had purchased earlier, and then, the next morning, visited friends together.[5]

1. *The motion to suppress.* We summarize the motion judge's findings of fact with regard to the motion to suppress. On Friday, June 12, 1987, the State police enlisted the assistance of the Taunton police in locating the defendant and bringing him in for questioning. When a Taunton police officer approached the defendant in a shopping mall and identified himself as a police officer, the defendant dropped a plastic bag to the ground. Believing the bag to contain marihuana, the police officer arrested the defendant for possession of a class D substance and brought him to the Taunton police station.

A State police corporal arrived at the station to question the defendant about the murder. After reading the defendant the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 478 (1966), and assuring himself that the defendant understood them, the corporal questioned the defendant about Ferreira. The defendant explained that he had been at a cookout with Ferreira when Ferreira told the defendant that he had stolen a car and killed a man. When the corporal asked the defendant to turn over his shoes, the defendant was "reluctant to" do so. At that point, the defendant requested a lawyer, the questioning ceased, and the defendant was returned to a cell at the station. Efforts were made to locate a public defender.

Also at this time, Ferreira was brought to the station. As Ferreira was being put in a cell, the defendant asked to speak with police again. The police repeated the Miranda warnings, and the defendant executed a waiver form. The police told the defendant that Ferreira had told them that the defendant had paid Ferreira $200 to burn the stolen car. The defendant denied this and offered to return the next day for a

---

[5]Ferreira's testimony was impeached by the testimony of a number of witnesses, including Ferreira's mother. These witnesses testified that, in conversations with them after the crime, Ferreira inculpated the defendant in the kidnapping and the murder.

polygraph test. The defendant stated that he was afraid of Ferreira and wanted to consult an attorney. The defendant then left the station.

Based on subsequent statements by Ferreira, the police obtained an arrest warrant for the defendant charging him with murder. On Monday, June 15,[6] the defendant was arrested by the Taunton police as he walked to the Taunton District Court to be arraigned on the possession of marihuana charge. He was brought to the station, read the warnings required by *Miranda* v. *Arizona, supra,* and again presented with a Miranda waiver form, which he executed. The defendant then made the statements that he sought to suppress: "I'll probably get blamed for the whole thing. I didn't do it. I went with Ferreira from Store 24 to the Route 140 rest area to rob queers. I saw him (Ferreira) pull a white cord around [the victim's] neck, kick and hit him. I left and didn't want any part of it. I didn't go there to kill anyone."

Relying on *Edwards* v. *Arizona,* 451 U.S. 477 (1981),[7] the defendant asserts that the judge erred in refusing to suppress his June 15 statement to the Taunton police because the questioning took place without counsel being present and after the defendant had invoked his right to have counsel present during the June 12 interview. In *Edwards,* the United States Supreme Court held that, when an accused has invoked his right to have counsel present during police questioning, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. In *Commonwealth* v. *Perez,* 411 Mass. 249 (1991), we took note of the "observation[ ]" of the Dis-

---

[6] The motion judge found that the second arrest took place on August 15, 1987. This appears to be an error. We conclude that the second arrest took place on June 15, not August 15, because of the motion judge's subsequent statement that "[t]he second police interview was three days" after the first interview, which took place on June 12. Neither party suggests that the August 15 date has any relevance in this matter.

[7] The defendant relies entirely on the Fifth and Fourteenth Amendments to the United States Constitution. Therefore, we do not discuss State constitutional law.

trict of Columbia Court of Appeals that the *Edwards* rule
applies "so long as the defendant remains in custody." *Id.* at
259 n.6, quoting *United States* v. *Green*, 592 A.2d 985 (D.C.
1991).

We now are confronted with the question of what effect
the defendant's release from custody has on the application
of the *Edwards* holding. Other courts have concluded that,
where there is a break in custody, *Edwards* does not require
that a subsequent statement be excluded. See *Dunkins* v.
*Thigpen*, 854 F.2d 394 (11th Cir. 1988), cert. denied, 489
U.S. 1059 (1989); *McFadden* v. *Garraghty*, 820 F.2d 654,
661 (4th Cir. 1987); *United States ex rel. Espinoza* v. *Fair-
man*, 813 F.2d 117, 125 (7th Cir.), cert. denied, 483 U.S.
1010 (1987); *United States* v. *Skinner*, 667 F.2d 1306, 1309
(9th Cir. 1982), cert. denied, 463 U.S. 1229 (1983). Accord
*People* v. *Trujillo*, 773 P.2d 1086, 1092 (Colo. 1989); *Wil-
son* v. *State*, 573 So. 2d 77, 79 (Fla. Dist. Ct. App. 1990);
*State* v. *Bymes*, 258 Ga. 813, 814 (1989); *State* v. *Norris*,
244 Kan. 326, 336 (1989); *State in the Interest of Wells*,
532 So. 2d 191, 196 (La. Ct. App. 1988); *State* v. *Furlough*,
797 S.W.2d 631, 640 (Tenn. Crim. App. 1990); *State* v.
*Stewart*, 113 Wash. 2d 462, 478-479 (1989), cert. denied,
494 U.S. 1020 (1990); *Brown* v. *State*, 661 P.2d 1024, 1029
(Wyo. 1983). We have found no authority to the contrary.[8]

We also conclude that, under Federal law, the application
of the *Edwards* rule requires continuous custody. When a de-
fendant is released from custody, the coercive effect of cus-
tody disappears.[9] Thus, once a defendant is freed, "the
heightened potential for state-coerced self-incrimination

---

[8]The defendant's reliance on *Minnick* v. *Mississippi*, 498 U.S. 146
(1990), is misplaced. *Minnick* establishes that the defendant's actual con-
sultation with counsel after invoking the right to do so will not prevent
application of the *Edwards* rule. *Id.* at 153. In *Minnick*, the defendant
never was released from custody. The case, therefore, does not address the
issue presented here. Accord *Willie* v. *State*, 585 So. 2d 660, 667 (Miss.
1991) (distinguishing *Minnick* on grounds of continuous custody).

[9]As in *Dunkins* v. *Thigpen*, 854 F.2d 394, 397 n.6 (11th Cir. 1988),
there is here "no contention that the break in custody was contrived or
pretextual." We therefore express no opinion as to the result in a similar

ends" and the Fifth Amendment right to counsel ends. *United States ex rel. Espinoza* v. *Fairman, supra* at 125, citing *United States* v. *Geittmann,* 733 F.2d 1419, 1429 (10th Cir. 1984); *United States* v. *Skinner, supra* at 1309.[10] The judge correctly denied the defendant's motion to suppress.

2. *The jury instructions.* The defendant challenges the judge's instructions on two grounds. The defendant first claims that the instruction on withdrawal from a joint venture impermissibly shifted to the defendant the burden to prove withdrawal. Second, the defendant maintains that the judge's instructions on joint venture gave the jury the erroneous impression that, if it found the defendant guilty of robbery,[11] it would be required also to find him guilty of kidnapping and murder.

The defendant did not object at the conclusion of the instructions. We therefore review the challenged instructions to determine whether the instructions, read as a whole, created a "substantial likelihood of a miscarriage of justice." G. L. c. 278, § 33E.[12] See *Commonwealth* v. *Gilchrist, ante* 216, 223

---

case in which there was shown to be "a contrived or pretextual break in custody." *Id.*

[10]The defendant asks us to reject the judge's finding that the defendant left the police station on Friday, June 12, 1987. "In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990), citing *Commonwealth* v. *Cunningham,* 405 Mass. 646, 655 (1989); *Commonwealth* v. *Melvin,* 399 Mass. 201, 204 (1987); *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978). On appeal, the defendant concedes that "it appears obvious that [the defendant] was released at some time before his arrest on the way to the Taunton District Court on Monday morning." The judge's finding that the defendant was released prior to the interrogation on Monday thus is supported by the evidence. Therefore, there is no "clear error" in the judge's finding.

[11]The defendant's trial strategy was not to contest going to the Route 140 rest area to commit unarmed robbery but, rather, to deny complicity in the kidnapping and murder.

[12]With respect to the kidnapping and unarmed robbery indictments, we review the instructions to determine whether there is "a serious and obvious error creating a substantial risk of a miscarriage of justice." *Commonwealth* v. *Pares-Ramirez,* 400 Mass. 604, 609 (1987), citing *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

(1992), citing *Commonwealth* v. *Dias*, 405 Mass. 131, 137 (1989). In support of his arguments, the defendant "parses the charge and attacks it piecemeal. We, however, view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). We conclude that the instructions, viewed as a whole, were substantially correct and do not require that the convictions be reversed.

A. *The instruction on withdrawal from a joint venture.* The instruction on withdrawal is set forth in the margin.[13] The defendant alleges that the judge erroneously shifted to the defendant the burden of proving withdrawal. The Commonwealth concedes that, in a case in which the evidence raises a question whether a defendant continued to be part of a joint venture, the Commonwealth has the burden of proving beyond a reasonable doubt the absence of abandonment. *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 n.7 (1988). The Commonwealth maintains, however, that the judge's charge, read in its entirety, made clear that the Commonwealth bore the burden of proving beyond a reasonable doubt that the defendant did not withdraw from the joint venture. We agree.

The defendant objects specifically to the judge's discussion of the conditions necessary "[f]or one to . . . escape liability for subsequent crimes." The defendant argues that the

---

[13]"Now, the law recognizes once in a joint venture you may withdraw from it. A defendant is not guilty of a crime committed by a joint venture[r] if he timely and [e]ffectively withdrew or abandoned the joint venture. To be effective, the withdrawal must have been communicated or brought to the attention of the other joint venturer and this must have been done early enough as to give the other party a reasonable opportunity to also withdraw. For one to abandon a criminal joint enterprise and thereby escape liability for subsequent crimes committed later, there must be at least an appreciable interval between the alleged termination and the subsequent crime. A detachment from the enterprise must be made before the subsequent crime has become so probable that it cannot be reasonably stayed and such notice or definite act of detachment must be made known to the other joint enterpriser so he will also have the opportunity to withdraw."

phrase "escape liability" shifted the burden of proof on the issue of withdrawal to the defendant. In support of his argument, the defendant relies on *Connolly* v. *Commonwealth*, 377 Mass. 527 (1979). That reliance is misplaced. In that case, we reversed a conviction based on a judge's instruction on self-defense. We concluded that the judge's use of the terms "find" and "finding," "especially when taken in relation to the judge's assertion that the defendant 'claims' self-defense as a 'ground of defense,' " *id.* at 533, impermissibly shifted the burden of proof to the defendant. ·No such language was used in the present case.

The judge in this case explained that "[t]he burden of proof is on the prosecutor. All presumptions of law, independent of evidence[, are] in favor of innocence . . . . If upon such proof presented here . . . there is reasonable doubt remaining, the accused is entitled to the benefit of it by acquittal . . . . The rule requires proof of guilt beyond a reasonable doubt and must be applied to every element of the separate crimes that are charged . . . ." Throughout the instructions, the judge repeatedly referred to the Commonwealth's burden of proof. In the joint venture instruction itself, the judge twice cautioned the jury that the Commonwealth was required to prove the joint venture beyond a reasonable doubt. Although we view the phrase used by the judge as ill-chosen, in view of the judge's thorough and correct instructions on the Commonwealth's burden of proof throughout the charge, we conclude that there is no substantial likelihood of a miscarriage of justice.

B. *The instruction on joint venture.* We set out the judge's instruction with respect to joint venture in the margin.[14] The

---

[14]"The last ₁matter I want to take up with you is probably the most important issue in the case. The government has proceeded in this case on the theory of joint venture, sometimes called joint enterprise. You must determine as an issue of fact in this case, you the jury must do this, whether or not there was a joint venture in which the defendant, and in this case, Mr. Ferreira, were engaged in a joint venture. A defendant is guilty if he associates himself with a criminal enterprise and participates to some extent in the commission of the crime. You must apply this now to all the crimes that this defendant is accused of.

defendant argues that the judge's description of the joint venture as "a common enterprise to commit the particular crime that he's charged with, that includes the murder, the robbery and the kidnapping" does not differentiate clearly between the three crimes. Thus, according to the defendant, a jury could conclude that, if the defendant participated "in the commission of any one of [the] three crimes" with which he was charged, the jury was bound to find him guilty of all three crimes that made up the joint venture.[15] The defendant asserts that the judge's explanation that "[t]he Commonwealth is not required to show that the defendant physically participated in the actual crime[,] but it must show that the defendant somehow participated in the venture to the extent

---

"In order to find the defendant guilty of a crime committed during a joint venture, the Commonwealth must prove two things and must prove them, again, beyond a reasonable doubt to you the jury. The first one is that this defendant associated himself with a criminal venture and that this defendant participated in the commission of the crime to some extent. In order to convict this defendant, you must find that he was actually engaged in a common enterprise to commit the particular crime that he's charged with, that includes the murder, the robbery and the kidnapping. The mere presence at the commission of a wrongful act and even failure to take affirmative steps to prevent it, do not render a person liable as a participant.

"If the defendant agreed with another person or persons to commit the crime and did nothing more than that alone, [that] does not make him part of a joint venture. Some active participation in or furtherance of the criminal enterprise is required in order to find him guilty of the crime. A finding of guilty under a joint venture theory must be based upon proof that the defendant either commanded, counseled, hired or otherwise procured the actual participation and rendered aid, assistance or encouragement to him or put himself in the position to render aid in the commission of the crime. The defendant's guilt is established when it is shown to you the jury beyond a reasonable doubt that he intentionally assisted and took part, in this case with Mr. Ferreira, in the commission of any one of these three crimes he's charged with; and he did this while sharing the mental state required for the crime.

"You may infer the necessary mental state from the defendant's knowledge of the circumstances and subsequent participation in the crime. The Commonwealth is not required to show that the defendant physically participated in the actual crime[,] but it must show that the defendant somehow participated in the venture to the extent that he sought to have it succeed."

[15]The Commonwealth did not proceed on a felony-murder theory.

that he sought to have it succeed" exacerbated the original error. The defendant claims that, taken together, the instructions permitted the jurors to convict the defendant of all three crimes if they found that the defendant was a joint venturer in any one of the crimes. We do not agree.[16]

The defendant's reading of the instruction on joint venture omits critical passages of the charge. At the conclusion of his charge, the judge told the jury to notify the court officer in attendance when it had "reached [its] verdict on all these three matters." Then the judge said to the jury: "I call upon you to *consider each* [matter] *separately*" (emphasis added). That instruction was clear and unambiguous.

We note that, throughout the instructions, the judge repeatedly told the jurors that the defendant was *"separately* indicted" (emphasis added) for each crime. In discussing verdict slips, the judge again emphasized that the jury would have "separate verdict slips because there are three *separate* indictments" (emphasis added). Moreover, the withdrawal instruction clearly stated that a defendant may "abandon a criminal joint enterprise and thereby escape liability for subsequent crimes." Thus, the jurors could not have concluded that the defendant's complicity in the robbery required convictions on the kidnapping and murder charges. Reading the instructions as a whole, we conclude that there is very little, if any, risk that the jurors did not understand that they should assess guilt for each crime separately. Cf. *Commonwealth* v. *Albert*, 391 Mass. 853, 858 (1984) ("whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction"), quoting *Sandstrom* v. *Mon-*

---

[16]The defendant's reliance on *Commonwealth* v. *Benders*, 361 Mass. 704 (1972), is misplaced. The judge in the present case instructed the jury that "mere presence at the commission of a wrongful act and even failure to take affirmative steps to prevent it, do not render a person liable as a [joint venturer]." *Commonwealth* v. *McMaster*, 21 Mass. App. Ct. 722 (1986), on which the defendant also relies, also is clearly distinguishable. Unlike the present case, however, in *McMaster*, it was the judge's failure to instruct the jury on the need to consider each crime separately that required reversal of the conviction. *Id.* at 731-732.

*tana*, 442 U.S. 510, 514 (1979). There is no substantial likelihood of a miscarriage of justice.

3. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to G. L. c. 278, § 33E. We conclude that justice does not require us to reduce the verdict of murder in the first degree to a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*