94 Cal.Rptr.2d 805 (2000)
79 Cal.App.4th 1324
The PEOPLE, Plaintiff and Respondent,
v.
Charles Edward STORM, Defendant and Appellant.
No. D030950.
Court of Appeal, Fourth District, Division One.
April 19, 2000.
Review Granted August 16, 2000.
*807 David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Sara Gros-Cloren and Holly D. Wilkens, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[1]
*806 BENKE, Acting P.J.
Charles Edward Storm was convicted of first degree murder. He appeals, arguing violation of his Miranda[2] rights, error in the exclusion of defense evidence and instructional error concerning murder and manslaughter.

FACTS

A. Prosecution Case

On November 2, 1996, at approximately 7:00 a.m., the body of appellant's wife Gloria Andrade was found at a roadside turnout near Julian. At about 10:00 p.m. that day, appellant called the police and reported Andrade missing.
Sheriffs detectives Rowe and Heilig went to appellant's apartment on November 4 at approximately 5:30 p.m. At first, appellant was told the officers were investigating his missing person report. As the interview progressed, the officers explained they were from homicide and that a body fitting the description of Andrade had been found. Appellant told the officers he had last seen Andrade Friday night.
Detective Rowe interviewed appellant at his home on November 21. Appellant stated he met Andrade shortly after she was released from County Mental Health and after she had attempted suicide. Over the several months before her death, Andrade became depressed. She began asking appellant to help her kill herself. At first appellant resisted but finally agreed to help her. On November 1, the couple left their apartment, purchased a bottle of vodka and drove to the mountains. Appellant stated he stabbed Andrade once in the chest and she sighed in relief. He then stabbed her in the back because he did not want her to suffer and wanted to be sure she was dead. Appellant stated as he placed the knife against Andrade's throat, the two kissed. Andrade helped him slide the knife across her neck and smiled after her throat was cut. Appellant stated he loved and respected Andrade and was convinced that killing her was an act of mercy.
Appellant showed Rowe the knife he used to kill Andrade. That knife and 12 others were seized from appellant's apartment. Seven of the knives were consistent with Andrade's wounds. The knife most *808 consistent with the wounds was the one pointed out by appellant.
An autopsy revealed the stab wound to Andrade's chest penetrated her heart. The stab wound in her back penetrated a lung. Because of the large amount of blood found in the penetrated lung, the pathologist opined Andrade was stabbed in the back prior to being stabbed in the chest. Andrade had three cuts to the left side of her neck and eight on the right. Since there was little blood in the neck wounds, the pathologist concluded Andrade's throat was cut after she was stabbed in the heart and near the time of death. There was no blood or defense wounds on Andrade's hands.
The coat Andrade was wearing was missing a button and the button loop was torn. The button was found eight feet from Andrade's body and there was a blood stain eight feet from the body.

B. Defense

Appellant testified and related the history of his relationship with Andrade. He stated while the two got along well, they did argue occasionally about household expenses and their sex life.
Financial pressures on the couple were mounting in the months before appellant killed Andrade. Andrade began to drink and became increasingly depressed. The two had serious arguments over money and Andrade's inability to control her drinking.
One positive event in their lives was that Andrade got a job. To celebrate, Andrade and appellant decided to go to the mountains for a picnic. They took a bottle of vodka and a loaf of bread and a knife to cut it. Appellant ate a couple of slices of bread. He gave a slice to Andrade but did not know if she ate it. At first all went well. As time passed, however, the two began arguing over appellant's failure to get a job and Andrade's drinking. As appellant packed up their belongings, Andrade commented that he was not "good in bed." Appellant stated he snapped. He grabbed Andrade by the collar and stabbed her in the back with the knife. He released her, moved to her front and stabbed her in the chest. Appellant stated that about one minute elapsed between the time he stabbed Andrade in the back and when he stabbed her in the chest. He then went into a frenzy and slashed at Andrade's throat.

C. Rebuttal

The pathologist stated the autopsy revealed no food in Andrade's stomach.

DISCUSSION

A. Miranda Violation

Appellant argues the trial court erred in admitting his out of court statements concerning the death of his wife.

1. Background

a. Investigation
Andrade's body was found on November 2, 1996. It was apparent she was the victim of a homicide. Sheriffs homicide detective Fredrick Rowe and a second officer went to appellant's residence on November 4. The officers were aware appellant had been convicted of a sex crime and had served time in prison. Appellant consented to a search of his apartment and car. Several items were collected. Before leaving, the officers asked appellant if he would submit to a polygraph examination at their office. He stated he would.
Rowe and appellant had difficulty reaching each other on the telephone but eventually agreed appellant would come to the sheriffs station on November 19. When appellant arrived on the 19th, he appeared not to have slept, seemed a bit stressed but was not uncomfortable talking to the officers. Rowe and appellant talked for 20 to 30 minutes in the lobby of the homicide division concerning what would take place. Appellant agreed to provide body samples *809 which he was told were needed for the investigation.
After the samples were taken, appellant and Rowe went to an interview room for the polygraph examination. The examination was conducted by Paul Redden, a civilian employee of the San Diego Police Department. Before appellant was interviewed and the test administered, Rowe, pursuant to policy, advised appellant of his Miranda rights. Appellant waived those rights. Rowe left the room but monitored the examination by video camera.

b. Redden's Interrogation
Before conducting the examination, Redden explained in detail how the polygraph worked and how the test would be conducted. He asked appellant general questions about his background and about his knowledge of the crime. Appellant denied any involvement in Andrade's death. Redden went over the short list of questions he would ask during the examination. Appellant was connected to the machine and the questions were asked. Appellant denied any involvement in the murder of his wife.
As the test progressed, Redden told appellant some of the questions seemed to be bothering him and the only explanation was that appellant was lying. The examination ended and appellant was unhooked from the machine.
Redden reviewed the test results and told appellant the probability of deception was 100 percent concerning appellant's denials of involvement in Andrade's death. When appellant stated that was unbelievable, Redden in detail reviewed how the test was scored. He then told appellant they should try to figure out what happened the night of Andrade's death because at some point appellant would have to deal with it.
Appellant replied: "I wanna help you guys close your case but um, uh, I better talk to an attorney first. Seriously. Yo-, you can understand that." When Redden stated he could, appellant continued: "I'd like to say somethin' off the record but I know that's impossible right now." Redden asked him to make the statement "for [his] own comfort." Appellant replied "She begged me to." When Redden asked why, appellant explained Andrade was suicidal and wanted appellant to help her kill herself. Listening to this exchange, Rowe did not consider appellant's comments a clear request for counsel.
When Redden asked appellant if he wanted to share anything with him to get it off his chest, appellant stated: "I, I honestly can't, I can't. You know, I [jeopardized] myself, you understand that." Redden stated he did but that sometimes it was better to talk. Appellant said no, he had talked too much already. Redden stated he was willing to listen. Appellant, sobbing and crying, made a rambling statement that he could not stand to watch her suffer, he could not think of a faster way and that he should have refused to take the polygraph test.
Appellant stated he was not saying he killed her. When Redden asked him what he was saying, appellant made another rambling statement during which he indicated he would be in jail the rest of his life. Redden told appellant it was best to talk because things kept inside tend to "eat us." Appellant replied: "Okay. But seriously I think I shouldn't talk about it `til I've consulted with somebody. I, I needed to consult with somebody, you understand that." Redden stated he did but he was there to listen if appellant wanted to talk. Appellant stated she begged him. Redden asked what she begged him to do. Appellant replied to help her die. Redden continued to discuss the crime and appellant continued to give details about the killing.
Eventually, appellant stated: "Like, like I say, I better stop. I better stop. I, I've asked to talk to an attorney, I better stop. I've already told you, told you too much and it's on tape." Appellant then stated: "You guys are gonna book me, you're gonna book me. If you're gonna give me a *810 chance to talk to an attorney, you're gonna give me a chance to talk to an attorney." Redden replied: "Well I don't make that decision." Redden indicated he could talk to the officers but he was also willing to listen to what appellant had to say. Appellant continued talking about the crime and stated he understood he was facing at least a charge of assisted suicide.
Rowe and other officers who were listening to the interview, concerned with appellant's statements about lawyers and silence, paged Redden. Redden stopped and left the room. Redden was told that no more questions would be asked. Rowe and Redden then returned. Appellant asked Rowe if he could get a cup of coffee. Rowe and Redden left appellant in the room for approximately one hour. When Rowe returned, he told appellant he was aware appellant made comments concerning the crime and asked for an attorney. Appellant stated he believed he should talk to an attorney before he said anything else. Rowe told appellant they could not talk to him, they were going to let him go. Rowe gave appellant his number and told him if he wanted to talk, he should call. Rowe told appellant: "[D]on't think this is over with by any ... means." Appellant stated he understood, that he knew he was not "getting away clean" and that he wished he had not said anything. Appellant departed.
When appellant was left alone in the room, Rowe called the district attorney's office for legal advice.
Rowe did not consider any of appellant's statements unequivocal requests for counsel or to remain silent. Rowe believed appellant had participated in Andrade's death and while he was not comfortable with letting appellant go, he believed that was the "avenue that [they were going to have] to take." Appellant was allowed to leave because the officers had some concern about the admissibility of the statement he made to Redden. Rowe concluded, based on the advice of counsel, that the officers would have to wait a couple of days before contacting appellant. He was aware of a United States Supreme Court case law holding that once a suspect invoked his Miranda rights, it is the suspect who must reinitiate any questioning. Rowe also believed if they went to appellant's house to interrogate him, they were not required to Mirandize him since he would not be in custody.

c. November 21 Interrogation
After appellant was released on November 19, he was not placed under surveillance. Appellant did not call Rowe. On November 21, Rowe and two other officers contacted appellant at his apartment. Rowe explained to appellant that when the interview was completed, the officers would leave and appellant could go back to what he was doing. Rowe stated they wanted to hear his side of the story. Rowe did not re-advise appellant of his Miranda rights. Appellant, at length and in detail, repeated his claim that he assisted Andrade in committing suicide.
At the end of the interview, appellant consented to a search of his apartment. The officer took knives and other items from the house and departed. Appellant's house was placed under surveillance. The next morning Rowe obtained a warrant for appellant's arrest. He returned to appellant's apartment and arrested him.

d. Ruling
The trial court found the November 19 interview conducted at the sheriffs station was noncustodial. The court noted appellant went to the station voluntarily in his own vehicle. The interview room was comfortably appointed and was not locked. Appellant signed a consent form before taking the polygraph examination. The court found that even after the results of the test were revealed to him, he was free to go.
The court also found that after it was revealed to appellant that the polygraph examination indicated he had lied, he first *811 requested an attorney and then repeatedly stated he wished to remain silent. The court found that because the interrogation was noncustodial, the police were not required to inform appellant of his Miranda rights. They did so, however, and when appellant requested counsel, the interrogation should have ended. The court suppressed essentially all of appellant's statements after his request for counsel.
As to the November 21 interrogation, the court noted the rule that once a suspect has invoked the right to counsel, no further interrogation may be undertaken without the presence of counsel unless it is the suspect who initiates further communication with the police. The court found the rule inapplicable in this case since appellant was not in custody during the November 19 interrogation.
The court further concluded the police were not required to re-advise appellant of his Miranda rights on November 21 since the interview, at his home and conducted with assurance the police would leave when the interrogation was completed, was noncustodial.

2. Discussion
Appellant argues the trial court erred in admitting his November 21 statements. He contends the interrogation conducted by polygraph examiner Redden on November 19 became, contrary to the finding of the trial court, custodial when appellant was told he had flunked the examination. Appellant agrees that the November 19 confession was properly excluded. He argues, however, the November 21 confession should have been excluded as well.
Appellant notes the rule that when a suspect invokes his Miranda rights no further interrogation may be undertaken unless initiated by the suspect. He acknowledges the related rule that when there is a meaningful break in custody following an invocation of Miranda rights officers may initiate an interrogation. He argues, however, the rule does not apply when the release from custody was pretextual and that any renewed interrogation must be proceeded by a readmonition. He argues his release in this case was pretextual, his interrogation not preceded by a readmonition and argues the statements he gave were inadmissible.

a. Law
In Miranda the court noted that compulsion is inherent in custodial interrogations and protective devices are necessary to insure that statements made under such circumstances result from free choice. The court required that when first subjected to custodial interrogation, a suspect must be informed of the right to silence and the right to the presence of counsel during questioning. If during questioning the suspect asks to remain silent or for counsel, interrogation must cease. (Miranda v. Arizona, supra, 384 U.S. at pp. 442-445, 86 S.Ct. 1602; People v. Bradford (1997) 15 Cal.4th 1229, 1310, 65 Cal. Rptr.2d 145, 939 P.2d 259; In re Bonnie H. (1997) 56 Cal.App.4th 563, 580, 65 Cal. Rptr.2d 513.) Since these requirements arise from the particularly coercive nature of custodial interrogations, when a police interview is either noncustodial or noninterrogative, Miranda does not apply. (People v. Mickey (1991) 54 Cal.3d 612, 648, 286 Cal.Rptr. 801, 818 P.2d 84.)
In Edwards v. Arizona (1981) 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378, the court held that to prevent the police from badgering a defendant into waiving previously asserted Miranda rights, no further interrogation may be undertaken unless the accused initiates communication with the police. (In re Bonnie H., supra, 56 Cal.App.4th at pp. 580-581, 65 Cal.Rptr.2d 513.) However, courts have uniformly concluded this rule only applies when the suspect had been in continuous custody. When there is a break in custody of a sufficient length such that the suspect has time to consult with counsel or other advisors, the police may on their own initiative re-contact the suspect. *812 This is so since the break in custody dissipates the inherently coercive effect of custody that is the basis for Miranda. (See e.g., In re Bonnie H., supra, 56 Cal. App.4th at pp. 579-585, 65 Cal.Rptr.2d 513; People v. Scaffidi (1992) 11 Cal. App.4th 145, 152, 15 Cal.Rptr.2d 167; Kyger v. Carlton (6th Cir.1998) 146 F.3d 374, 380-381; Levy, Non-Continuous Custody and the Miranda-Edwards Rule: Break in Custody Severs Safeguards (1994) 20 New Eng. J. on Crim. & Civ. Confinement 539.)[3]
Some cases add an additional proviso to the break in custody rule. They require "a good faith release of custody, one that is not contrived or pretextual on the part of the police." (People v. Bonnie H., supra, 56 Cal.App.4th at p. 584, 65 Cal.Rptr.2d 513; People v. Scaffidi, supra, 11 Cal. App.4th at p. 154, 15 Cal.Rptr.2d 167; Dunkins v. Thigpen, supra, 854 F.2d at p. 397, fn. 6; Willie v. State, supra, 585 So.2d at p. 667; People v. Trujillo, supra, 773 P.2d at p. 1092; Wilson v. State, supra, 573 So.2d at p. 79; People v. Trujillo, supra, 773 P.2d at p. 1090; State v. Byrnes, supra, 375 S.E.2d at p. 42; Com. v. Galford, supra, 597 N.E.2d at p. 414, fn. 9; State v. Kyger, supra, 787 S.W.2d at p. 25, fn. 5.)
In none of these cases, however, was there an issue of pretextual release and no case has stated specifically what the term means. The origin of the requirement seems to be this footnote from Dunkins v. Thigpen, supra, 854 F.2d at page 397, footnote 6: "There is no contention that the break in custody was contrived or pretextual. We do not imply that our holding would be the same in the event of a contrived or pretextual break in custody."
While this court in In re Bonnie H. described the break in custody rule using the proviso that release not be pretextual, there was no claim of a pretextual break of custody in that case and we did not review the basis for that requirement. Since we find, contrary to the ruling of the trial court, that appellant was in custody during the November 19 interrogation and since a claim exists his release was pretextual, we now must examine the applicability, if any, of the pretextual break in custody proviso. Doing so, we hold the proviso is without support and we reject it. We do so because the proviso is unrelated to and does not advance the policy basis that supports the requirements both for the giving of Miranda rights and the prohibition against attempts at the re-initiation of interrogation of those in custody who have invoked their rights.
The reason for both rules is the inherently coercive nature of custody. The policy basis for the break in custody exception to the Edwards rule is that release dissipates that coercive element and allows the suspect to seek legal or other counsel. If the basis for the break in custody exception is the impact of release on the suspect's psyche, then the motivation for that release is of no consequence. *813 (See Levy, Non-continuous Custody and the Miranda-Edwards Rule: Break in Custody Severs Safeguards, supra, 20 New Eng. J. on Crim. & Civ. Confinement at pp. 584-587.) Neither can a tactical decision to release a suspect who has invoked be described as an improper attempt to overcome rights. Miranda rights exist only in the context of a custodial interrogation and the Edwards rule exists only during continuous custody. That the police believe a release may make a later confession more likely is not an abuse of, or an attempt to avoid, any right. As long as the reinitiated contact complies with Miranda, i.e., if the renewed contact is a custodial interrogation, there must be an admonition and waiver, and the tactics employed by the police are not badgering or harassing, there is no impropriety in releasing a suspect with the intent to later contact him with the hope of reinitiating interrogation.[4]
We think it useful to note that even assuming a lack of pretext is a component of the break in custody rule, there was no pretextual release in this case. It is certainly true that the police, fearful appellant's admissions were inadmissible, hoped if he was released, he might later make an admissible statement. It is also clear, however, the police were concerned that without the admissions, they not only have no prosecutable case but had no basis to hold appellant. Appellant's release was not pretextual, it was dictated by a lack of evidence.

b. Analysis
There is no doubt appellant was interrogated both on November 19 and 21. The crucial question is whether he was in custody during those interrogations.
Custody in this context means a formal arrest, a restraint on freedom of movement of a degree associated with a formal arrest or a deprivation of freedom in any significant way. The question is an objective one, that is, would a reasonable person under the circumstances conclude he was in custody. (Stansbury v. California (1994) 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293; People v. Ochoa (1998) 19 Cal.4th 353, 401-402, 79 Cal. Rptr.2d 408, 966 P.2d 442; People v. Stansbury (1995) 9 Cal.4th 824, 830-831, 38 Cal.Rptr.2d 394, 889 P.2d 588; People v. Mosley (1999) 73 Cal.App.4th 1081, 1088-1089, 87 Cal.Rptr.2d 325.)
In addressing that issue, we defer to the trial court's findings on disputed facts when supported by substantial evidence but independently decide if under the facts found a reasonable person would believe himself in custody at the time of the interrogation. (People v. Ochoa, supra, 19 Cal.4th at p. 402, 79 Cal.Rptr.2d 408, 966 P.2d 442.)
We conclude, contrary to the conclusion of the trial court, that a reasonable person would have concluded himself in custody at that point during the November 19 interrogation when the polygraph operator told him he had badly flunked the examination. When confronted at the police station with the officer's desire to take forensic samples and subject him to a polygraph examination, a reasonable person would conclude the investigation was focusing on him as the possible killer. This conclusion would be buttressed by the Miranda, admonition given before the examination began. Given that appellant voluntarily came to the station, the lack of direct accusations and the absence of any significant indicia of restraint, a reasonable person would not believe himself initially in custody.
*814 However, when appellant was told he had abysmally failed the polygraph test and therefore was lying when he denied he killed his wife, the only reasonable conclusion appellant could reach was that he was then no longer free to leave. The change in circumstances was not lost on appellant since he almost immediately invoked, unsuccessfully, his right to counsel.
Even if we were to conclude appellant was not in custody when informed of his performance on the polygraph, he was certainly in custody seconds later when he admitted killing his wife. Again, appellant clearly and reasonably was aware that he was in custody since he stated he knew he would be "booked."
The November 19 confession was excluded by the trial court. What is important is the legal and factual effect that the interrogation, invocation, denial of Miranda rights and confession had on the admissibility of appellant's November 21 statement.
Whether appellant's release on November 19 was "pretextual" or legally required or a combination of those and other considerations, is irrelevant to the propriety of the reinitiated interrogation on November 21. Appellant had not been in continuous custody between November 19 and 21, the period appellant was free of custody was sufficient to allow consultation with legal or other advisors and the police did not use the release as a device for harassing or badgering appellant. It was proper for the police to reinitiate contact with appellant on November 21.
The police were not required to Mirandize appellant before interrogating him on November 21. The interview was conducted at appellant's home, there was no indication appellant would be placed under arrest and the police engaged in no conduct suggesting appellant was in custody. Indeed, the officers told appellant that at the conclusion of the interview, they would depart. Under such circumstances, a reasonable person would not conclude himself in custody. The trial court properly admitted appellant's November 21 statement.
B.-C[*]

DISPOSITION
The judgment is affirmed.
HUFFMAN, J., and NARES, J., concur.
NOTES
[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of DISCUSSION parts B and C.
[2] Miranda v. Arizona (1966) 384 U.S. 436, 442-445, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[3] U.S. v. Bautista (10th Cir.1998) 145 F.3d 1140, 1146-1147; U.S. v. Barlow (5th Cir. 1994) 41 F.3d XXX-XXX-XXX; U.S. v. Hines (9th Cir.1992) 963 F.2d 255, 256-257; Dunkins v. Thigpen (11th Cir.1988) 854 F.2d 394, 397-398; McFadden v. Garraghty (4th Cir. 1987) 820 F.2d 654, 661; U.S. ex rel. Espinoza v. Fairman (7th Cir.1987) 813 F.2d 117, 125; U.S. v. Skinner (9th Cir. 1982) 667 F.2d 1306, 1309; U.S. v. Drake (N.D.Ill.1996) 934 F.Supp. 953, 962; U.S. v. Garey (D.Vt.1993) 813 F.Supp. 1069, 1073, aff'd (2d Cir. 1994) 19 F.3d 8; People v. Trujillo (Colo.1989) 773 P.2d 1086, 1091-1092; Gonzalez v. State (Fla. App. 3d Dist.1984) 449 So.2d 882, 886; Keys v. State (Fla.App. 1st Dist.1992) 606 So.2d 669, 671-672; State v. Byrnes (1989) 258 Ga. 813, 375 S.E.2d 41, 41-42; Wilson v.State (1994) 264 Ga. 287, 444 S.E.2d 306, 309; State v. Norris (1989) 244 Kan. 326, 768 P.2d 296, 301-302; State in Interest of Wells (La. App. 3d Cir.1988) 532 So.2d 191, 195-197; Com. v. Galford (1992) 413 Mass. 364, 597 N.E.2d 410, 413-414; Willie v. State (Miss. 1991) 585 So.2d 660, 666-667; State v. Kyger (Tenn.Crim.App.1989) 787 S.W.2d 13, 24-25; State v. Furlough (Tenn.Crim.App.1990) 797 S.W.2d 631, 640-641; Tipton v. Com. (1994) 18 Va.App. 832, 447 S.E.2d 539, 540-541; State v. McKenzie (1996) 197 W.Va. 429, 475 S.E.2d 521, 529-530.
[4] Appellant, citing In re Bonnie H., supra, 56 Cal.App.4th at page 584, 65 Cal.Rptr.2d 513, argues for a reinitiated interrogation to be lawful, not only must there be a nonpretextual break in custody but any later interrogation must be proceeded by a Miranda warning. The requirement for a Miranda warning only applies when, as in Bonnie H., the reinitiated contacted is a custodial interrogation.
[*] See footnote 1, ante.