[No. D025382. Fourth Dist., Div. One. July 16, 1997.]

In re BONNIE H., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
BONNIE H., Defendant and Appellant.

565

**COUNSEL**

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Holley A. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

HUFFMAN, J.—In this bizarre murder case resembling an episode out of *The Streets of San Francisco*, we hold there is no public policy reason a good faith break in a minor's custody should not dissipate the prophylactic rule of *Edwards* v. *Arizona* (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378], as expanded by *Arizona* v. *Roberson* (1988) 486 U.S. 675 [108 S.Ct. 2093, 100 L.Ed.2d 704] and *Minnick* v. *Mississippi* (1990) 498 U.S. 146 [111 S.Ct. 486, 112 L.Ed.2d 489], that once a suspect asserts his or her Fifth Amendment right to counsel during custodial interrogation, the current questioning and any further questioning initiated by the police about the current or any other offense must cease until counsel is present (see *McNeil* v. *Wisconsin* (1991) 501 U.S. 171, 176-177 [111 S.Ct. 2204, 2208, 115 L.Ed.2d 158]).

The police first questioned the minor, Bonnie H., age 16, about the suicide/murder of Trisha Sullivan on May 12, 1995. When Bonnie, who gave her name as "Mystical Misscotte"[1] and age as 19, requested an attorney in response to being read her *Miranda*[2] rights, questioning stopped. Although initially arrested for the crime, Bonnie was released without pending charges a few days later.

On June 26, 1995, Bonnie was rearrested for the same crime at her mother's home in San Diego and taken to juvenile hall. When questioned

---

[1]She also identified herself as "Mystic Miscotte."

[2]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

this time, after proper *Miranda* warnings, Bonnie waived her rights to remain silent and to have the assistance of counsel, making numerous statements incriminating herself in Sullivan's death in San Francisco. On June 30, 1995, the San Francisco County District Attorney filed a Welfare and Institutions Code section 602 petition charging Bonnie with Sullivan's murder (Pen. Code, § 187).

In December 1995, a juvenile court judge in San Francisco denied Bonnie's motion to suppress her statements made at the second custodial interview conducted in San Diego. After a contested jurisdictional hearing, he found the allegations of the petition to be true and declared the murder to be in the first degree. The case was transferred to San Diego Juvenile Court for disposition. The juvenile judge here adjudged Bonnie a ward of the court and committed her to the California Youth Authority for a maximum period of 25 years to life.

Bonnie appeals, contending the juvenile court judge erred in denying her motion to suppress her admissions obtained by police during a custodial interrogation after she had earlier invoked her right to counsel in violation of the *Edwards-Roberson-Minnick* rule and in finding she validly waived her Fifth Amendment right against self-incrimination under the totality of the circumstances in this case.

We find Bonnie "knowingly and voluntarily" waived her rights against self-incrimination after full *Miranda* warnings at the second custodial interrogation, that there was a good faith break in custody between this police-initiated custodial session and the first custodial interrogation where Bonnie invoked her right to counsel, and that such break effectively removed the *Edwards-Roberson-Minnick* bar against the use of her statements at the jurisdictional hearing. We therefore conclude the juvenile court properly denied Bonnie's suppression motion and affirm the judgment.

## BACKGROUND

Bonnie does not challenge the sufficiency of the evidence to support the juvenile court's true finding she murdered Sullivan. Rather, the facts pertinent to our discussion of her appellate issues come from the extensive Evidence Code section 402 hearing conducted at the time of the jurisdictional hearing to determine the admissibility of her statements made at the June 26, 1995, custodial interrogation in San Diego.

*Supportive Evidence*:

In support of the motion to suppress her statements, Bonnie testified she and a friend, Martin Androus, were awakened by police at 10:30 a.m. on

May 12, 1995, at the "Dolores Street Squat," a burned-out church in San Francisco. The police took both her and Martin, handcuffed and in separate cars, to the Mission Police Station. Upon arriving there, Bonnie was separately questioned about Sullivan's death at the church earlier that morning by San Francisco Police Inspector Alex Fagan, who did not advise her of her rights. The interview was tape-recorded.

Bonnie was then escorted to an interview room at the homicide detail where Fagan advised her of her rights to remain silent and to an attorney. Although she asked for an attorney, Fagan continued to question her about Sullivan's death. After spending four days in jail, Bonnie was released.

On June 26, 1995, Bonnie was living with her sister in San Diego. At 5:30 a.m. on that date her mother had come to take her to her house to wait for the cable repairman. Her mother later telephoned her there to tell Bonnie the police were on their way to talk to her.

Within three minutes the police knocked on her mother's door. When Bonnie answered, she saw a "bunch of people" at the door in "jump suits and boots and guns," with "flashlights and stuff," and was scared. The people identified themselves as the FBI and told her they had a warrant for her arrest because she had killed someone. Bonnie was scared, upset and confused and told the six police officers, who arrived in three or four cars, her real name and age, denying her name was "Misscotte."

After the officers showed her the warrant, they took off her jewelry and handcuffed her. When they took her out to an unmarked car, other officers were bringing her sister in handcuffs to the mother's house. Bonnie started to cry. She talked to her sister who was then uncuffed and gave her a hug. When Bonnie was put in the front seat of the car, her mother arrived at the scene. Bonnie asked the officer to please wait so she could say good-bye and talk to her mother. The officer rolled down the window and Bonnie told her mother, "Good-bye, I love you."

Bonnie said she was terrified, confused and crying when she was taken to juvenile hall. She was first taken to a processing tank, strip-searched and given juvenile hall clothes in exchange for her own clothing, jewelry and toe ring. Bonnie estimated she was taken into custody about 7:30 a.m., was in the tank for a few hours, and was taken to a unit about 1 p.m. She did not see a telephone in the processing tank and did not attempt to use the pay telephone at the maximum security unit as she did not know if she would be allowed to do so. The person processing her in did not discuss whether she could use a telephone.

Bonnie said that shortly after being taken to the unit, she was placed in an interview room where a fat, White, balding, old (45 to 50 years old) probation officer visited her. After introducing himself he gave her a *Miranda* card to read, which she signed and dated after she circled "No" as to whether she would be willing to talk with him. Because she "never know[s] what day it is," she merely copied the date the probation officer had put on the card. Before he left the room upset and disappointed, she asked him if she could call her mother because she was confused, scared, wanted some advice as to what to do and to let her know where she was. The probation officer told her phone calls were something earned with a number of points rather than given.

Bonnie was then taken to another interview room where Fagan was waiting for her. She sat facing Fagan and a window to the hallway. While they were engaging in "small talk," Bonnie saw her mother and sister walk by the interview room. They waved and smiled at her and she jumped up out of her seat and tried to get out the door, yelling, "Hey, that's my mom and my sister. Can I go talk to them?" Fagan told her to sit and calm down, that she could talk with them after they were done. Fagan then started the interview.

When he read her the *Miranda* rights, Bonnie felt uncertain and intimidated. She knew she had a right to an attorney, but thought it would be a waste of time because she had asked for one in San Francisco and was not given one. She told Fagan that yes, she would talk to him, "[b]ecause I just don't know." She guessed it was because she was scared and intimidated and did not feel she had the right to say no.

On cross-examination, Bonnie clarified she was questioned at the Mission Street Station by Fagan without the advisal of rights about Sullivan's death for an hour and at "homicide" for barely a minute. She denied she ever indicated she had anything to do with Sullivan's death. She told Fagan her name was Mystical Misscotte, but denied that name in San Diego. In San Francisco, she was not "Bonnie," she was 19 years old, and she "never meant to be a juvenile in San Francisco." She knew the information she gave the police was false. Bonnie claimed she asked for an attorney before talking with Fagan in San Francisco and that the officers kept questioning her after she asked for an attorney.

Bonnie also said she talked with a police officer during the transport to homicide about turning the radio to some music, but not about the law. She denied she was on drugs or any medication that morning. She was tired from sleeplessness from hitchhiking from New Mexico to San Francisco in three

days with only two to three hours of sleep. When she arrived in San Francisco around midnight on May 12, 1995, she had not eaten in two days.

Bonnie did not know how long she lived with her sister in San Diego after her release from jail. After leaving San Francisco, she went to Sacramento first, where she was caught shoplifting and then sent to San Diego by the police. She did not discuss the Sullivan incident with her mother or sister, although her sister knew she had been in jail in San Francisco.

On the day of her arrest in San Diego, she had not eaten before being questioned by Fagan. Although she was confused, scared and shocked, she was not blind to the fact she was being arrested for Sullivan's death in San Francisco. She did not recall the arresting agents questioning her about the incident. She denied a probation officer named Michael Angus had anything to do with her processing at juvenile hall, claiming that only a woman probation officer processed her.

Bonnie also claimed it took Fagan almost 10 minutes to unwrap the tape and get the tape recorder ready to begin the interview in San Diego. During that time, he chatted about the fact he and his wife were in San Diego on vacation and Bonnie reiterated she saw her mother and sister. Bonnie agreed that when Fagan turned on the tape recorder he provided her with her rights and told her her parents had been notified of the charges and arrest. She did not remember the exact wording of the rights given because she was scared and wanted her mother.

In answer to questions about her education and health, Bonnie said she had completed ninth grade in public schools, was hypoglycemic and an insomniac. She also stated she did not discuss any potential legal problems with any family member after she got to San Diego and had at no time after her release asked anybody for a lawyer.

On redirect, Bonnie said that when she asked Fagan in San Francisco whether she needed an attorney, he told her it was her decision. She did not ask for one after she was released because she was not sure what she should do and she did not feel the need for one. She did not talk about the Sullivan death with anyone because it was in the past and she did not want to think about it anymore. She asked to speak to or call her mother numerous times before the interview with Fagan and was never told she had a right to talk to her mother before that interview.

Bonnie's mother (Mother) also testified in support of the motion. Around 7 a.m. on June 26, 1995, she called Bonnie from work to tell her the police

and FBI had notified her they had a warrant to arrest Bonnie and intended to do so at Mother's house. Mother then drove home and found the agents already there with Bonnie in a car and her sister standing next to the car. The agent Mother talked to on the telephone showed her the arrest warrant for Bonnie and told her the police were taking Bonnie to juvenile hall for booking. Although Mother wanted to talk longer with Bonnie, she only had the opportunity to say good-bye.

Mother and Bonnie's sister went to juvenile hall about 1 p.m. that day because they were told they could not speak to Bonnie over the telephone. After they identified themselves and signed in, they were asked to wait until a Mr. Angus could talk with them. Later, they were taken to another area and passed by a window where they saw Bonnie talking with Fagan. Bonnie acknowledged them. When they tried to approach the window "a guard or something" told them they had to sit and wait on a bench about 12 feet down on the opposite side of the hall. Mother did not remember Fagan coming out to talk to them until after he finished the interview and told them they could go in to visit with Bonnie. Bonnie was crying when Mother and her sister went into the room to see her. Mother did not remember seeing Bonnie cry when she had earlier seen her through the window.

*The Opposition Evidence*:

Several San Francisco police officers testified about the circumstances leading to Bonnie's first custodial interrogation. A police sergeant at the Mission Station who had received a tip about a suicide at the Dolores Street church went there and found Bonnie and Martin sleeping on mattresses in the abandoned church. He detained them for trespassing and they were transported to Mission Station. At the station, Bonnie was interviewed by Fagan and Inspector Michael Johnson about the reported suicide in the church. Bonnie was not read any rights at that time because the officers had not yet determined she was a suspect in the death and only wanted to find out what she knew about the incident.

Bonnie told the officers her name was "Mystical Misscotte," that she was 19 years old, that she had no family and had grown up on the streets. She was vague and evasive about her identity and background, and did not ask to speak with her parents or any other family members. She knew the victim Sullivan by the name of "Stevie." During an overview of the events that night in which Bonnie "distanced herself" from the incident, she indicated Stevie had "taken a cord and wrapped it around her neck and strangled herself." Thinking Bonnie might be a suspect in a person's death, not just a witness to a suicide, the officers decided they should take her downtown for

further questioning. After the officers interviewed Bonnie's friend Martin, their suspicions increased.

Bonnie was transported to the homicide detail at the Hall of Justice by San Francisco Police Officer William Murray. When they were in an elevator at the Hall of Justice, Bonnie asked Murray, "Is it against the law to help someone kill themselves?" After Murray told her it would depend on the circumstances, gave her the example of Dr. Kevorkian and told her he was not the right person to ask since he was not an attorney, Bonnie said she told her friend how to commit suicide and when it was over she helped move the body.

Bonnie was placed in an interview room with Fagan and Johnson to conduct a videotaped interview.[3] Fagan read Bonnie her rights and Bonnie requested an attorney, stating "Hey, that is cool. I've never had an attorney. I'd like one." When she was asked whether she understood her rights, Bonnie said, "Yes," and the interview was concluded. When she continued talking about the incident, the officers told her they did not want to talk about it and told her what was going to happen to her. Bonnie was then booked for Sullivan's murder, but released a few days later.[4]

After further investigation, an arrest warrant for Bonnie was issued on June 20, 1995.[5] Johnson was notified in San Francisco that Bonnie had been arrested in San Diego by the FBI. Johnson then notified his partner Fagan, who was in San Diego on vacation, that the warrant had been served and Bonnie was at juvenile hall. Fagan then made arrangements to interview Bonnie at that facility.

When Fagan arrived at juvenile hall between 1:00 and 1:45 p.m., he contacted Angus who admitted him to the interview area and helped him obtain a tape recorder. After about 20 minutes, Fagan entered an interview room where Bonnie was already seated. The room was about 15 feet by 6 feet and constructed with a partial wall and glass above. During the interview Bonnie sat facing the glass portion and hallway while Fagan sat facing her. Fagan estimated he was in the room about two minutes before he started the first tape. During that time, he briefly told Bonnie, who recognized him, that he was in San Diego on vacation with his family when he was notified of her arrest.

---

[3]Unfortunately, only the visual portion of that tape functioned properly; no audio recording came through.

[4]Fagan was notified that Bonnie was released due to lack of evidence to prosecute.

[5]Additional information obtained in the investigation revealed that after their respective releases from jail, Bonnie and Martin made certain incriminating statements to people on the street and a woman working at the Rolling Pin Donut shop about a newspaper article written about Sullivan's suicide/murder.

After Fagan turned on the tape, he learned that Mystical Misscotte was not Bonnie's real name. He then admonished her about her *Miranda* rights, repeating them two or three times to "make sure, very clear, not only in [his] mind, but in [Bonnie's] mind, that she understood that [he] was going to interview her and informed her of her rights." Within the admonishments, Fagan told Bonnie that her parents had been notified and reminded her he had advised her of the same rights, especially the right to an attorney, on May 12, 1995. Bonnie indicated she understood her rights and would talk to Fagan.

Because Fagan did not have his case file with him, he suggested Bonnie tell him about the incident at the Dolores Street church on May 12, 1995. After Bonnie narrated the events leading up to Sullivan's death at the church, which included statements incriminating herself,[6] Fagan concluded the first tape. He then put in a second tape to interview Bonnie about alleged statements made at the Rolling Pin Donut shop after Bonnie and Martin had been released from jail in San Francisco. Before asking any questions on the subject, Fagan again reminded Bonnie of her *Miranda* rights and specifically the right to have an attorney; he asked if she still understood and waived those rights and was willing to continue talking with him. Bonnie answered affirmatively and proceeded to make further incriminating statements.[7] Fagan estimated the total interview time was approximately 1 hour, with 45 minutes of that time evidenced by the first tape and about 15 minutes on the second tape. Both tapes and transcripts of the tapes were entered into evidence.

Fagan's testimony also included the same background information as that included in Johnson's testimony concerning the initial May 12, 1995, investigation of Sullivan's death and the questioning of Bonnie at that time.

In regard to the San Diego June 26, 1995, interview, Fagan was certain Bonnie had at no time indicated during the interview that she saw her mother or that she wanted to talk with her. Nor did Bonnie ever get up from her seat. If Bonnie had asked for her mother, Fagan would have considered such a

---

[6]Bonnie told Fagan she was part of a group that stayed with Sullivan after midnight on May 12, 1995, while Sullivan tried to end her own life before sunrise, first by injecting air into her veins and then later by strangling herself with a tie provided by Martin which Sullivan wrapped and tied around her own neck. When Sullivan could no longer hold the ends of the tie, she asked Bonnie to hold them for her. Bonnie did so, because "that was what she had asked me to do." Sullivan died while Bonnie, Martin and another friend prayed over her and blessed her. Afterwards they put Sullivan's body in a closet, covered it with styrofoam and went downstairs to sleep.

[7]Although Bonnie denied agreeing with Martin when he told the woman at the donut shop that he and Bonnie had killed Sullivan, she told Fagan she had helped Sullivan "who was going to die anyways" by "assisting a suicide."

request to be an invocation of her right to counsel and would have stopped the interview. Fagan was not aware of Mother's presence at juvenile hall until after the interview had concluded and he left the interview room.

Although Fagan first characterized Bonnie's demeanor at the juvenile hall interview as very focused, jovial and happy, a playback of the beginning of the first tape revealed Bonnie was "sniffling" and did not sound upbeat or happy. Fagan opined Bonnie's demeanor changed during the course of the interview and that she was actually in a better mood at this second interrogation than during her first on May 12, 1995.

Angus, the main deputy probation officer assigned to the custody intake unit at juvenile hall, also testified in opposition to the suppression motion. He stated that Bonnie was brought to the hall for processing about 8:45 a.m. on June 26, 1995, by a multiagency violent crimes felony task force, consisting of probation officers, FBI agents and the United States Marshal's Service. The task force brought a copy of the San Francisco arrest warrant for Bonnie with them. Angus supervised Bonnie's processing. He remembered Bonnie was not read her *Miranda* rights during the processing, she did not ask to call her mother, and she was not told she could not call her mother. Because it was a busy morning, it was possible Bonnie did not have an opportunity to use the telephone until after she was processed. Angus did recall he had received a telephone call from Mother and probably told her Bonnie could not receive telephone calls, but that Mother could visit her any time during the first 48 hours after Bonnie was processed into a unit. Neither Bonnie nor her mother complained to Angus about the inability to contact one another. Bonnie's processing was completed at 10:50 a.m. and she was then placed in a living unit. The next morning, Angus assigned Charles Brown as the probation officer for Bonnie's case. The written waiver form reflecting Bonnie refused to talk with Brown on June 28, 1995, was entered into evidence.

*Further Suppression Motion Proceedings and Court's Ruling*:

After taking the matter under submission, the court denied Bonnie's motion to suppress. In its lengthy ruling, the court recited the issues, the pertinent facts and its resolution of the conflicts in the facts. The court specifically found Bonnie had not requested to talk to her mother during the interview, believing Fagan and not Bonnie concerning that issue.[8] The court also found Bonnie had not talked with the "balding" probation officer on

[8]Although the court incorrectly found Bonnie had not testified that she wanted to speak with her mother while in the presence of Fagan, it clearly did not believe Bonnie's testimony on this point when considered in light of the opening portion of the tape which reflected that

June 26, 1995, finding her refusal to waive her rights on that card dated June 28 did not apply to the waiver issue for the motion.

The court further stated: "In evaluating the totality of circumstances, the trial court is required to consider all the circumstances surrounding the interrogation of this minor: age, experience, background, and whether she has the capacity to understand the warnings given to her. In this case, the minor, on a prior occasion, asserted her right to counsel and that stopped the interrogation process. Presumably, that instance, approximately one-month-old, was still fresh in the memory of the minor. The Court observed the minor on the stand and found her to be intelligent enough to understand the proceedings, and [she] pointed out on several occasions to the cross-examiner that she had answered his questions previously. [¶] She was able to advise the police falsely as to her age and background information on May 12, 1995. Prior to the May 12th incident, the minor was essentially travelling on her own in the southwest. She inquired of assisted suicide as a crime with the police enroute to the homicide detail. She asked to play the radio; was residing with her family for a period before her arrest on June 26, 1995. There is simply nothing in this record to suggest the minor did not understand the potential consequences of discussing incriminating events with the police. Indeed, the record supports the legal standards that she so realized by clearly more than a preponderance of the evidence. [¶] While minor relied on [case law] for the proposition that a request to speak with parents in the case of the minor is just like an adult requesting an attorney, this Court is bound by the totality rule of [*Fare* v. *Michael C.* (*Fare*) (1979) 442 U.S. 707, 725 (99 S.Ct. 2560, 2571-2572, 61 L.Ed.2d 197)]. [Minor's cited cases] no longer announce a bright line rule in this area. The Federal standard is not so simple. Indeed, *Fare* strongly suggests that the invocation of the right to counsel is critical in this assertion process. Justice Blackmun pointed out that it is the desire for a lawyer and the role an attorney plays in the 5th Amendment process that is the triggering mechanism in ceasing the interrogation. [(*Fare*, *supra*, 442 U.S. at p. 716 [99 S.Ct. at p. 2567].)] Trusting relationships of a minor with a family member or other court officer do not always reach the level necessary to cease the interrogation; quoting the *Fare* case: [']Such an exten[s]ion would impose the burden associated with the rule of *Miranda* on the justice system and the police without serving the interests that the rule was designed simultaneously to protect.['] [¶ . . . [¶] It is also true that [*Edwards* v. *Arizona*, *supra*, 451 U.S. 477], prevents law enforcement interrogation of the person in custody after that person has

---

Bonnie only indicated she wanted to answer Fagan's questions. The court further noted that even if Bonnie had attempted to speak with her mother and had been told by Fagan that she could not do so, it would have found such request not of the quality of conduct to support an invocation of the right to counsel under current law.

invoked her right to counsel. However, the rule of *Edwards* applies to instances of continuous custody. Several Federal cases have determined that the police may initiate interviews with suspects after they are released from custody, quote: [']Courts of Appeal[s] have held that even when the police unlawfully ignore a defendant's request for counsel, subsequent confessions obtained from them, even if the police initiated the interrogation, are admissible if there has been an intervening break in custody.['] [(*Dunkins* v. *Thigpen* (11th Cir. 1988) 854 F.2d 394, 397; also *McFadden* v. *Garraghty* (4th Cir. 1987) 820 F.2d 654, 661; *U.S.* v. *Fairman* (7th Cir. 1987) 813 F.2d 117, 125; *U.S.* v. *Skinner* (9th Cir. 1982) 667 F.2d 1306, 1309.)] [¶] California recently found these cases were persuasive and adopted the same position. [(*People* v. *Scaffidi* (1992) 11 Cal.App.4th 145, 152 [15 Cal.Rptr.2d 167].)] Here, the minor was out of custody after May of 1995. One would suspect that she would discuss with someone the circumstances in San Francisco. Inspector Fagan cannot be penalized for commencing an interrogation more than a month later in the minor's hometown, under these facts. [¶] Therefore, the motion to suppress the statement[s] of the minor on June 26, 1995 on the grounds that she invoked her *Miranda* rights is denied."

## DISCUSSION

Bonnie challenges the juvenile court's ruling denying her suppression motion on grounds her incriminating statements were obtained by the police during a custodial interrogation after she had invoked her right to counsel and, on the alternative ground, that if her invocation of the right to counsel were not applicable due to her release from custody, her subsequent waiver of her rights was invalid because such was not knowing and voluntary under the totality of the circumstances.

We will address these contentions in reverse order. ■ In reviewing such constitutional issues, we apply well-established law that: " ' "We must accept the [juvenile] court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the [juvenile] court, whether the challenged statement[s were] illegally obtained. [Citation.]" ' [Citations.]" (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 128 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

### I

### *Voluntary Waiver*

■ Bonnie claims her waiver of her *Miranda* rights at the June 26, 1995, interview with Fagan was unknowing and involuntary because it arose

from a "sense of fear and futility" stemming out of facts she was not allowed to talk to her mother and she had earlier requested an attorney and one had not been appointed. She also asserts the juvenile court failed to review the validity of her waiver with the "special caution" she was entitled to receive as a minor. We disagree.

█ To establish a valid waiver of an accused person's right to counsel and to remain silent, the People must show, by a preponderance of the evidence, that the accused voluntarily, knowingly and intelligently waived such rights. (*Colorado* v. *Connelly* (1986) 479 U.S. 157 [107 S.Ct. 515, 93 L.Ed.2d 473]; *People* v. *Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].) The court determines the validity of the waiver from an evaluation of the totality of the circumstances. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 475-477 [86 S.Ct. at pp. 1628-1629].) "This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." (*Fare* v. *Michael C.* (1979) 442 U.S. 707, 725 [99 S.Ct. 2560, 2571-2572, 61 L.Ed.2d 197].)

Clearly, the United States Supreme Court in *Fare* addressed Bonnie's concern the trial court needed to treat an evaluation of a minor's waiver like hers different than that of an adult and resolved the matter against her. That court specifically stated: "We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived [her] rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether [she] has the capacity to understand the warnings given [her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights. [Citation.]" (*Fare* v. *Michael C., supra,* 442 U.S. at p. 725 [99 S.Ct. at p. 2572].) The court in *Fare* also found juvenile courts were especially equipped to deal with any special concerns present when a young person, like Bonnie, "often with limited experience and education and with immature judgment," is involved. (*Fare* v. *Michael C., supra,* 442 U.S. at p. 725 [99 S.Ct. at p. 2572].)

Further, with respect to any claim that parental consent is necessary for the validity of a minor's waiver of *Miranda* rights, our Supreme Court has long held that ". . . a mere failure of the authorities to seek the additional consent of an adult[, such as a parent or guardian,] cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made." (*People* v. *Lara* (1967) 67 Cal.2d 365, 378-379 [62 Cal.Rptr. 586, 432 P.2d 202].)

 Here, the trial court relied on the standard articulated in *Fare* in ruling Bonnie's *Miranda* waiver was valid. After reviewing the evidence before the juvenile court for the suppression hearing, we believe its conclusion was correct. The transcript of the interrogation, as well as Fagan's testimony, which was not contradicted by Bonnie regarding the *Miranda* advisements, reveals he took care to ensure that Bonnie understood her rights. In addition to fully explaining at least three times that she had the right to counsel and the right to remain silent, Fagan also told Bonnie that her parents had been notified of the charges against her. Accepting the juvenile court's resolution of the conflicting facts, Bonnie never indicated to Fagan she wanted to speak with her mother. Only after ascertaining that Bonnie understood her *Miranda* rights and was willing to talk with him and waive those rights did Fagan have Bonnie discuss the events involving Sullivan's death on May 12, 1995. There is nothing in the record to show Bonnie did not understand what Fagan told her.

Further, there are no special factors in the record that reveal Bonnie was incapable of understanding the nature of her actions. As the trial court noted, Bonnie's intelligence was evidenced by her own testimony at the hearing when she reminded counsel of questions he had already posed to her. Although she was a 16-year-old juvenile, she was streetwise, having run away from home at the ages of 13 and 15, and having traveled and lived on her own in San Francisco and the Southwest. Five weeks earlier, while she was living on the streets of San Francisco, Bonnie had been arrested and questioned about Sullivan's death. At that time she lied to the police about her name, age, and family background. She inquired of the police regarding assisted suicide and asserted her right to counsel when Fagan and Johnson read her her *Miranda* rights which stopped the interrogation process. Bonnie knew from this experience that she could end an interrogation by asking again to meet with an attorney. Because Bonnie was released from jail in San Francisco without charges pending there was no need for the authorities there to satisfy her request for counsel.

After her release, Bonnie freely talked about the Sullivan incident with friends at a San Francisco donut shop and then traveled to Sacramento where she was arrested for shoplifting and sent home to San Diego. Before the June 26, 1995, arrest she lived with her family in San Diego. It was her own decision whether to obtain an attorney or talk with her mother and family about Sullivan's death. Her mother notified her by telephone that the FBI agents were coming to arrest her. When the agents arrived, they identified themselves and showed her the warrant charging her with murder for Sullivan's death in San Francisco. She was also allowed to hug her sister and say good-bye to her and her mother before being taken to juvenile hall by one of the agents in the front seat of an unmarked car.

There is simply no indication in the record Bonnie was of "insufficient intelligence to understand the rights [she] was waiving, or what the consequences of that waiver would be." (*Fare* v. *Michael C., supra*, 442 U.S. at p. 726 [99 S.Ct. p. 2572].) Nor is there any evidence Bonnie was "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." (*Id.* at p. 727 [99 S.Ct. at pp. 2572-2573].) Therefore, under the totality of the circumstances, we believe, as the juvenile court found, Bonnie voluntarily and knowingly waived her Fifth Amendment rights.

Bonnie's claims of coercive pressure are unfounded. While arguably the serving of the arrest warrant by several FBI agents may have frightened Bonnie, there is no evidence of any intimidation or threats by any of those officers, by the probation officers processing her into juvenile hall or by Fagan when he met with her in an interview room at the hall while he prepared the tape recorder and allowed her to narrate her statements. Her overly dramatized view of the June 26, 1995, events is simply belied by the record.[9] Based on the juvenile court's firsthand observation of the witnesses to the events involved, we can find no reason to dispute its conclusion Bonnie's statements were voluntary and the result of a knowing and intelligent waiver of her *Miranda* rights.

## II

### *Effect of Break in Custody*

Having concluded Bonnie's waiver at the June 26, 1995, interview that was valid, the question becomes whether there is any public policy reason the break in Bonnie's custody between her first police-initiated interrogation where she invoked her right to counsel should not dissipate the *Edwards-Roberson-Minnick* bar to the use of her otherwise voluntary statements made at the second custodial interview. Bonnie contends the addition of *Minnick* to the *Edwards* equation implicitly rejects any "break-in-custody" exception to the *Edwards* bright-line rule that might exist. Alternatively, she argues even if a break in custody permits resumption of interrogation of adults, it should not do so in the case of minors.

As Bonnie correctly points out, neither the United States Supreme Court nor the California Supreme Court has expressly addressed the issue. The one

[9]We do not address Bonnie's assertion raised for the first time on appeal that the *Miranda* card executed on June 28, 1995, showed a violation of Welfare and Institutions Code section 625 (inaccurately referred to in her opening brief as a violation of Welfare and Institutions Code section 615, a section which does not exist). Nor do we discuss the claimed Welfare and Institutions Code section 627, subdivision (b) violation regarding a probation officer's duty to advise a minor of her right to telephone calls. Such section defines the duty and offense of a public officer "who willfully deprives a minor taken into custody of [her] right to make such telephone calls . . . ."

California appellate court that has addressed the issue of a break in custody in the *Edwards* context for an adult criminal case decided without analysis in accordance with lower federal court cases that the *Edwards* ban would dissolve for that particular noncontinuous custody situation. (*People* v. *Scaffidi* (1992) 11 Cal.App.4th 145, 152 [15 Cal.Rptr.2d 167].) Although we reach the same result as that in *Scaffidi*, we do so for slightly different reasons.

In *Miranda*, the United States Supreme Court established a "prophylactic" rule to implement the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination and to offset the " 'inherently compelling pressures' " of custodial interrogation. (*McNeil* v. *Wisconsin, supra,* 501 U.S. at p. 176 [111 S.Ct. at p. 2208]; *Miranda* v. *Arizona, supra,* 384 U.S. at p. 446 [86 S.Ct. at p. 1613].) ". . . [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [86 S.Ct. at p. 1612].)

The court in *Miranda* made clear that once the above warnings were given, certain procedures must be followed when a person in custody indicates a desire to have an attorney: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [86 S.Ct. at p. 1628].)

In *Edwards* v. *Arizona, supra,* 451 U.S. 477, the United States Supreme Court added a second tier to the prophylaxis for the *Miranda* right to counsel: "[Once] an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

communication, exchanges, or conversations with the police." (*Edwards* v. *Arizona*, *supra*, 451 U.S. at pp. 484-485 [101 S.Ct. at p. 1633], fn. omitted.) This bright-line "*Edwards* rule" prohibits all police overreaching, be it "deliberate or unintentional[,]" (*Smith* v. *Illinois* (1984) 469 U.S. 91, 98 [105 S.Ct. 490, 494, 83 L.Ed.2d 488]), and was specifically "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (*Michigan* v. *Harvey* (1990) 494 U.S. 344, 350 [110 S.Ct. 1176, 1180, 108 L.Ed.2d 293].)

The United States Supreme Court further expanded and clarified the *Edwards* rule in *Arizona* v. *Roberson*, *supra*, 486 U.S. 675 and *Minnick* v. *Mississippi*, *supra*, 498 U.S. 146. After reiterating the justification for the prophylactic *Edwards* rule, the court in *Roberson* held that when a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reinterrogated about any offense unless counsel is present. (*Arizona* v. *Roberson*, *supra*, 486 U.S. at p. 683 [108 S.Ct. at p. 2099].) The court reasoned that once a suspect invokes the right to counsel, thereby showing "he considers himself unable to deal with the pressures of custodial interrogation without legal assistance[,]" such presumption does not disappear "simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." (*Ibid.*) The court stressed that the accused there was in continuous custody from the time he asserted his right through the impermissible questioning and was never free of the coercive environment. (*Id.* at p. 686 [108 S.Ct. at p. 2099].) It was the inherently compelling pressures "created by [such] prolonged police custody" that mandated application of the *Edwards* rule. (*Ibid.*, fn. omitted.)

The United States Supreme court in *Minnick* clarified that: "[A] fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. . . . [O]n this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." (*Minnick* v. *Mississippi*, *supra*, 498 U.S. at p. 153 [111 S.Ct. at p. 491].) The court in *Minnick* justified this extension of the *Edwards* rule by the fact that "[a] single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged." (*Ibid.*)

However, in light of the remedial purpose for the *Edwards* rule in preventing police badgering during custodial questioning, many jurisdictions have declined to apply the *Edwards* rule where a defendant has not been in

continuous custody but is instead reinterrogated after being released from custody. (See *Dunkins* v. *Thigpen* (11th Cir. 1988) 854 F.2d 394, 396-398 [*Edwards* rule no bar to a defendant's statements made after interruption in custody]; *McFadden* v. *Garraghty* (4th Cir. 1987) 820 F.2d 654, 661 [same]; *U.S.* ex rel. *Espinoza* v. *Fairman* (7th Cir. 1987) 813 F.2d 117, 125 [same]; *United States* v. *Geittmann* (10th Cir. 1984) 733 F.2d 1419 [same]; *United States* v. *Skinner* (9th Cir. 1982) 667 F.2d 1306, 1309 [same]; *Wilson* v. *State* (Fla.Dist.Ct.App. 1990) 573 So.2d 77, 79 [same]; *State* v. *Furlough* (Tenn.Crim.App. 1990) 797 S.W.2d 631, 640 [same]; *State* v. *Stewart* (1989) 113 Wn.2d 462 [780 P.2d 844, 852] [same]; *People* v. *Trujillo* (Colo. 1989) 773 P.2d 1086, 1091-1092 [same]; *State* v. *Norris* (1989) 244 Kan. 326 [768 P.2d 296] [same]; *State* v. *Bymes* (1989) 258 Ga. 813 [375 S.E.2d 41, 42] [same]; *Bussard* v. *State* (1988) 296 Ark. 556 [759 S.W.2d 24, 26] [same]; *State in Interest of Wells* (La.Ct.App. 1988) 532 So.2d 191, 195-197 [same]; *Brown* v. *State* (Wyo. 1983) 661 P.2d 1024 [same].) "The rationale behind these decisions generally is that a non-contrived, non-pretextual break in custody where the defendant has reasonable opportunity to contact his attorney dissolves an *Edwards* . . . claim. [Citations.]" (*Willie* v. *State* (Miss. 1991) 585 So.2d 660, 667.)

The cases from other jurisdictions that have expressly addressed the argument Bonnie now makes, i.e., that the "break-in-custody exception" to the *Edwards* rule has been superceded by the decision in *Minnick*, have rejected such interpretation. (See *United States* v. *Vaughters* (C.A.A.F. 1996) 44 M.J. 377 (*Vaughters*), cert. den. *sub nom. Vaughters* v. *United States* (1996) __ U.S. __ [117 S.Ct. 587, 136 L.Ed.2d 516]; *Willie* v. *State, supra,* 585 So.2d at p. 667.)

The Mississippi Supreme Court in *Willie* v. *State* stressed the factor of "continuous custody" that increased the coercive pressures on the defendant in *Minnick* as the primary reason for that court to apply the *Edwards* bar. (*Willie* v. *State, supra,* 585 So.2d at p. 667.) It thus found the holding of *Minnick* limited to where custody is continuous and adopted its own rule based on the rationale it had found after a review of the above-cited other jurisdiction cases. (*Ibid.*)

Similarly, the United States Court of Appeals for the Armed Forces[10] recently disagreed that the *Edwards* rule precluded any exception for suspects who are released from custody after the decision in *Minnick*. (See

---

[10]The United States Supreme Court in *Davis* v. *United States* (1994) 512 U.S. 452 [114 S.Ct. 2350, 129 L.Ed.2d 362] noted that although it had never considered whether the Fifth Amendment right to counsel during custodial interrogations applies on its own to the military, it proceeded on the assumption in that case that the civilian authorities construing such right would equally apply to military interrogations and control the admissibility of evidence at military trials. (*Id.* at p. 457, fn. * [114 S.Ct. at p. 2354].)

*Vaughters, supra,* 44 M.J. at p. 379.) In *Vaughters* the suspect had been released from custody for 19 days before he was taken back into custody and reinterrogated. In finding the statements taken at the second interrogation admissible, the court reasoned that *Minnick* was distinguishable from the present situation because it was a continuous-custody case, citing dictum in *McNeil* v. *Wisconsin, supra,* 501 U.S. at page 177 [111 S.Ct. at page 2208] that suggests *Edwards* does not apply where there has been a "break in custody"; that federal civilian Court of Appeals cases continue to apply the break-in-custody exception even after the *Minnick* decision, citing *U.S.* v. *Barlow* (5th Cir. 1994) 41 F.3d 935, 945 and *U.S.* v. *Hines* (9th Cir. 1992) 963 F.2d 255, 256-257; and that it was persuaded the *Edwards* progeny "did not intend to preclude further interrogation by police where a suspect has been provided . . . 'a real opportunity to seek legal advice.' [Citations.]" (*Vaughters, supra,* 44 M.J. at p. 379.)

We have found no authority holding the *Edwards-Roberson-Minnick* bar must be applied where there is a good faith break in custody. The California Court of Appeal in *Scaffidi* impliedly found decisions from other jurisdictions, including one decided after *Minnick,* persuasive in holding ". . . the *Edwards* ban was dissolved by the break with respect to [that] defendant's request for counsel during his first custody." (*People* v. *Scaffidi, supra,* 11 Cal.App.4th at p. 152.)

After review of the authorities from other jurisdictions in light of the stated purpose for the prophylactic rules of *Miranda* and *Edwards,* we are likewise persuaded by such decisions that the good faith release of a suspect, after the suspect has invoked the right to counsel during police custodial interrogation, terminates the need for the *Edwards-Roberson-Minnick* rule. Once released, the suspect is no longer under the "inherently compelling pressures" of continuous custody where there is a reasonable possibility of wearing the suspect down by badgering police tactics to the point the suspect would waive the previously invoked right to counsel. A break in custody between the first and second interrogations also provides the suspect the opportunity to speak with an attorney, family member or any person the suspect cares to consult without police constraints.

As the United Supreme Court in *Connecticut* v. *Barrett* (1987) 479 U.S. 523, 528 [107 S.Ct. 828, 832 93 L.Ed.2d 920] reminds us, "[i]t remains clear . . . that [the *Edwards*] prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose." Hence, to find the *Edwards* rule applicable in non-continuous custody situations would simply not further the purpose of the rule, which we have set out at length above.

We therefore find that a suspect's request for counsel during police custodial interrogation followed by a termination of questioning and a good faith release of custody, one that is not contrived or pretextual on the part of the police, does not prohibit police-initiated interrogation at a later time provided the suspect is properly advised of his or her *Miranda* rights before reinterrogation. In otherwords, we hold the *Edwards* rule, even after the decision in *Minnick*, does not bar the admission of statements made by a suspect during a police-initiated custodial interrogation when the suspect is properly advised of her rights after a good faith break in custody.[11]

Moreover, like the United States Supreme Court in *Fare*, we can "discern no persuasive reasons why any other approach is required where" a minor rather than an adult is involved. (*Fare* v. *Michael C. supra*, 442 U.S. at p. 725 [99 S.Ct. at p. 2572].) Where there is a break in custody, the learned juvenile court judge can easily consider that fact along with the other circumstances in determining the validity of the waiver at the second interrogation. There is simply no public policy reason the *Edwards-Roberson-Minnick* rule should not be dissipated by a good faith break in a minor's custody.

Here, when Bonnie requested counsel at her first interrogation in San Francisco, questioning ceased and she was released from custody. She has presented no evidence to show her release was contrived, pretextual or done in bad faith. Nor is there any evidence in the record of improper conduct by Fagan or other police authorities. As noted above, the totality of the circumstances revealed Bonnie validly waived her *Miranda* rights at the time of her

---

[11]Our holding finds some support in *People* v. *Mack* (1980) 27 Cal.3d 145 [165 Cal.Rptr. 113, 611 P.2d 454], a pre-Proposition-8 case. There, our Supreme Court held that the defendant, who had been released on the original charges after declining to make a statement, at liberty for five or six days before being rearrested and readvised before confessing, had voluntarily waived his rights for the admission of his confession. (*Id.* at p. 154.) In doing so, the court noted that: "During that considerable period the police exerted no pressure whatsoever on defendant to confess. He was entirely free to consult 'family, friends, or counsel' concerning the charges he knew, or should have known, would be brought against him . . . . He knew his rights. He had asserted them when first arrested. In the interim he had an opportunity to carefully consider his predicament and to seek any support needed—personal or professional—to continue asserting his rights, if he so chose." (*Ibid.*) The same common-sense rationale applies here.

Moreover, recently, in setting out the general law concerning the *Edwards* rule after a suspect has requested counsel during a custodial interrogation, our Supreme Court in *People* v. *Crittenden, supra*, 9 Cal.4th at page 128, stated: "If, subsequently, *assuming there is no break in custody*, the police initiate a meeting in the absence of counsel, the suspect's statements are presumed involuntary and are inadmissible as substantive evidence at trial, even if the suspect executes a waiver and the statements would be considered voluntary under traditional standards. [Citations.]" (Italics added.) Although this statement is taken from dictum in *McNeil* v. *Wisconsin, supra*, 501 U.S. at pages 176-177 [111 S.Ct. at page 2208], we find it further supportive of our holding.

second custodial interrogation. On these facts, we conclude Bonnie's break in custody dissolved the *Edwards-Roberson-Minnick* bar to the admission of her statements obtained at the second police interview. Accordingly, we find the juvenile court properly denied Bonnie's suppression motion.

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 22, 1997.