Filed 11/5/13  P. v. Gonzales CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GERALD LUIS GONZALES,<br><br>    Defendant and Appellant. | B242748<br><br>(Los Angeles County<br>Super. Ct. No. VA114826) |

       APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

       John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

       Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A jury convicted defendant Gerald Luis Gonzales of the first degree murder of Gerald Ramirez (Pen. Code, § 187, subd. (a)) and possession of a firearm by a felon (*id.*, § 12021, subd. (a)(1)). The jury also found true the allegations that Gonzales personally used a firearm (*id.*, § 12022.53, subd. (b)), personally and intentionally discharged a firearm, causing great bodily injury and death (*id.*, § 12022.53, subds. (c) & (d)), committed the crime for the benefit of, at the direction of, and in association with a criminal street gang (*id.*, § 186.22, subd. (b)(1)(C)). After the trial court found true the allegations that Gonzales suffered two prior strike convictions (*id.*, §§ 667, subds. (b)-(i), 1170.12), the court sentenced Gonzales to state prison for a total term of 110 years to life.

Gonzales' sole contention on appeal is that the trial court erred in failing to suppress statements he made to police during an interrogation. We conclude that the trial court did not err in denying Gonzales' motion to suppress the statements, and affirm.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

In the early morning hours of April 2, 2010 police found Ramirez dead in a converted garage in Santa Fe Springs. The cause of death was a single gunshot wound to the head. There were no signs of a struggle, and Ramirez had no defensive wounds. Police determined that Gonzales lived in the garage, which was located behind his family's residence, and that Ramirez had been staying with Gonzales. Both men were members of the Conta Ranas gang. Police broadcast a description of Gonzales.

Later that afternoon, police apprehended Gonzales in the San Gabriel riverbed. At the police station, Whittier Police Detective Robert Wolfe advised Gonzales of his

---

[1]  Because this appeal involves the narrow issue of the trial court's ruling on the motion to suppress, it is unnecessary to set forth in detail the facts regarding the killing, the investigation, or the extensive gang evidence introduced during trial.

*Miranda*[2] rights. Gonzales stated he understood his rights but did not ask for an attorney. During the subsequent two-hour videotaped interrogation, Gonzales initially claimed that he returned home to find his friend dead. Eventually, he confessed to killing Ramirez for gang-related reasons.

Prior to trial Gonzales filed a motion seeking exclusion of his videotaped statements to police on the ground, among others, that his waiver of his *Miranda* rights was tainted because he had previously requested an attorney. Gonzales stated in his supporting declaration that at the scene of his arrest he recognized one of the police officers, Detective Jerry Reyes, and told him, "I want my lawyer."

The trial court held an evidentiary hearing pursuant to Evidence Code section 402, prior to which defense counsel clarified that "[t]he basis for the suppression is not a, quote, *Miranda* violation, because on its face there appears to be a compliant warning." Counsel emphasized that the basis for the motion was "the fact that he invoked his right to counsel in the field, if you will, while being arrested."

Whittier Police Detective Joie Tinajero and Detective Wolfe testified for the People. According to Detective Tinajero, around 3:00 p.m. on April 2, 2010, in response to information that Gonzales had been spotted running southbound in the San Gabriel riverbed, he and his partner, Detective Sanchez, drove past Gonzales, got out of their car, walked down into the riverbed, and waited for him. When Gonzales was about 20 feet away, the detectives stepped out from behind a tree and ordered him to the ground at gunpoint. After Gonzales complied, Detective Tinajero handcuffed him. During the time Gonzales was with Detective Tinajero, he did not ask the detective why the officers were arresting him. Gonzales also did not ask for an attorney or to speak with anyone else. Detective Tinajero did not ask Gonzales any questions regarding the murder investigation. The detective stayed with Gonzales until Detective Wolfe arrived. Once Detective Wolfe arrived at the riverbed, he took custody of Gonzales.

---

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

Detective Tinajero further stated that there were a number of police officers at the riverbed. He remembered seeing Detective Reyes but did not know the extent of his involvement with or his proximity to Gonzales. To Detective Tinajero's knowledge, Detective Reyes was not close enough to Gonzales to hear anything Gonzales said. Detective Tinajero, however, was not aware of where Detective Reyes was at all times.

When Detective Wolfe arrived at the riverbed with his partner, Detective Todd, Gonzales was in the custody of Detectives Tinajero and Sanchez.[3] Detective Wolfe took custody of Gonzales, who was handcuffed and seated on the bike path with his legs extended along a fence. Detective Wolfe was with Gonzales for approximately 30 minutes. During this time, Gonzales did not ask why he had been arrested, did not say he wanted to speak with a lawyer, and did not tell Detective Wolfe he did not want to talk to him. Gonzales did not appear disoriented or confused, suffering from a mental problem, or under the influence of a controlled substance or alcohol. Within five minutes of his arrival, Detective Wolfe asked Gonzales, without reading Gonzales his *Miranda* rights before doing so, where the gun was, because Detective Wolfe was concerned about public safety. Based on Gonzales' responses, police were able to locate the gun, which was in a public place and loaded.[4] Eventually, the officers placed Gonzales into a patrol car and transported him to the police station. Detective Wolfe stated that if Gonzales had told another officer he wanted a lawyer, that officer would have informed him of Gonzales' request.

After returning to the police station, Detective Wolfe advised Gonzales of his *Miranda* rights.[5] Gonzales stated that he understood his rights and did not appear to be

---

[3] When Detective Wolfe arrived on the scene Detective Reyes "was within the vicinity of us" and then he "walked away." Detective Wolfe noted, however, that everyone was "within a line of sight of each other."

[4] Gonzales did not challenge the admissibility of these statements or of the gun.

[5] Approximately three hours passed between the time Detective Wolfe arrived at the riverbed and the time he interviewed Gonzales.

confused or disoriented or hallucinating. Gonzales did not state that he was extremely high or severely intoxicated. He gave no indication that he did not understand what Detective Wolfe was saying. Gonzales did not ask for an attorney or refuse to talk to the detective. Detective Wolfe knew Gonzales from previous contacts and a prior arrest. At no time during the interview did Gonzales complain of being tired or wanting to sleep or having a "cloudy" mind. He also never claimed to have told another officer that he wanted to talk to a lawyer.

After listening to the testimony presented at the evidentiary hearing and the argument of counsel,[6] the trial court ruled that "[b]ased upon the testimony and I've read the declaration again, the motion to suppress is denied." Defense counsel then stated a continuing objection to the use of the videotape of Gonzales' admission, which was played for the jury.

Gonzales testified at trial. He stated that many of the statements he made during his interview were lies. Gonzales testified that Ramirez had left his gun on the couch with the hammer cocked. When Ramirez returned home, Gonzales retrieved the gun, which Ramirez had placed on a shelf, and asked Ramirez to uncock the gun and put it away. Ramirez, who was tired and lying down, told Gonzales to do it for him. When Gonzales, who did not think the gun was loaded, attempted to uncock the hammer, the weapon accidentally discharged, killing Ramirez. Gonzales called out Ramirez's name but did not know what to do. He ran from the scene, taking the gun with him, which he hid on a nearby street. Gonzales testified that "[i]t was an accident. And I turned this accident into one ugly lie." He admitted to using methamphetamine regularly and claimed that he had been "up for days" and was "high as a kite just tweaking out."

---

[6] The record is silent as to why the People did not call Detective Reyes to testify at the Evidence Code section 402 hearing.

5

When an arrestee invokes his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484 [101 S.Ct. 1880, 68 L.Ed.2d 378], fn. omitted.) In fact, an accused who has asked for an attorney "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" (*id.* at pp. 484-485; accord, *Minnick v. Mississippi* (1990) 498 U.S. 146, 150, 153 [111 S.Ct. 486, 112 L.Ed.2d 489]; *Arizona v. Roberson* (1988) 486 U.S. 675, 677 [108 S.Ct. 2093, 100 L.Ed.2d 704]) or there has been a break in custody (*People v. Storm* (2002) 28 Cal.4th 1007, 1013; *In re Bonnie H.* (1997) 56 Cal.App.4th 563, 584). "'"Even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." [Citation.]'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1311.)

The purpose of the rule in *Edwards v. Arizona*, *supra*, 451 U.S. 477, "is to preserve '"the integrity of an accused's choice to communicate with police only through counsel," [citation] by "prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights" [citation].' [Citation.] It 'is not a constitutional mandate, but judicially prescribed prophylaxis.' [Citation.] Application of the *Edwards* rule 'is "justified only by reference to its prophylactic purpose"' and its presumption is not to be uncritically extended. [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 926.)

Implied in the trial court's ruling on the admissibility of evidence is "whatever finding of fact is prerequisite thereto." (Evid. Code, § 402, subd. (c); see *People v. DeHoyos* (2013) 57 Cal.4th 79, 132.) Implied in the trial court's ruling here denying

Gonzales' motion to exclude his videotaped statement is the court's factual finding that Gonzales did not ask any of the officers, including Detective Reyes, for an attorney while at the riverbed. Substantial evidence supports this finding. (See *People v. Gamache* (2010) 48 Cal.4th 347, 385; *People v. Waidla* (2000) 22 Cal.4th 690, 730.)

Detective Tinajero, along with his partner, intercepted Gonzales as he fled in the riverbed. They ordered him to stop at gunpoint and took him into custody. Detective Tinajero stayed with Gonzales until Detective Wolfe arrived on the scene. At that point Detective Tinajero turned over custody of Gonzales to Detective Wolfe, who stayed with Gonzales until placing him into a patrol car for transportation to the police station. Although Detective Tinajero and Detective Wolfe confirmed that Detective Reyes was present at the river bed, neither heard Gonzales ask for an attorney.

The fact that Detective Reyes did not testify at the Evidence Code section 402 hearing does not mean that the trial court's finding is not supported by substantial evidence. There was testimony at the hearing that due to their close proximity to Gonzales, Detectives Tinajero and Wolfe would have heard Gonzales if he had said something to Detective Reyes or made a statement about wanting to speak with an attorney. They did not hear any such statements. Moreover, Detective Wolfe testified that, if Gonzales had made such a request, the officer to whom the request had been made would have advised him.

The People presented ample evidence establishing that Gonzales did not ask for an attorney at the riverbed and that there was no violation of *Edwards v. Arizona*, *supra*, 451 U.S. 477. We have no basis to disturb the trial court's decision to deny Gonzales' motion to suppress and to allow the People to present Gonzales' videotaped statement to the jury.

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.